UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASON SETH PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-03373-JRS-TAB |
| | ) | |
| GREGORY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting in Part and Denying in Part Medical Defendants' Motion for Summary Judgment, Granting State Defendants' Motion for Summary Judgment, and Granting in Part and Denying in Part Correctional Facility Defendants' Motion for Summary Judgment**

Plaintiff Jason Perry, an inmate at Wabash Valley Correctional Facility (WVCF), brings this lawsuit pursuant 42 U.S.C. § 1983 alleging that he received inadequate treatment for a Hepatitis C ("HCV") infection, chest pains, trouble breathing, and bumps in this throat. He also alleges that he was subjected to a cell with mold in the vent and that another inmate threatened to contaminate his food. Based on these allegations, he stated claims of deliberate indifference under the Eighth Amendment and retaliation under the First Amendment and state law medical malpractice claims. He has sued medical providers, state officials, and correctional officers, alleging that each of them was in some way responsible for his mistreatment.

Defendants Theresa Auler, Samuel Byrd, Mark Cabrera, Kelly Durm, Jane Gregory, Bruce Ippel, Michael Mitcheff, Marrissa Runyan, and Stacey Scott ("the Medical Defendants"), Michael Smith and Robert Stafford ("the State Defendants"), and Keith Butts, Myra Strobel, Officer Gaddis, Officer Martin, Sergeant Heady, Thelma Nornes, Captain Thompson ("the Correctional Facility Defendants") seek summary judgment on Mr. Perry's claims. For the following reasons the Medical Defendants' motion for summary judgment is granted in part and denied in part, the

State Defendants' motion for summary judgment is granted, and the Correctional Facility Defendants' motion for summary judgment is granted in part and denied in part.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896

(7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 572-73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## I. Facts

The following statement of facts has been considered pursuant to the standard set forth above. Thus, the facts are considered undisputed except where disputes are noted.

### A. The Parties

#### 1. The Plaintiff

Jason Perry is an inmate of the Indiana Department of Correction (IDOC) and has been incarcerated at WVCF since December 20, 2018. Dkt. 381-9, p. 3 (Perry Dep. at 151:18-25). He was also incarcerated at New Castle Correctional Facility (NCCF) during the time relevant to his claims.

### 2. The Medical Defendants

During all times relevant to the Complaint, Dr. Samuel Byrd was employed by Wexford of Indiana, LLC (Wexford) as a physician at WVCF. Dkt. 381-1 ¶ 2.

From April 10, 2017 through February 23, 2018, Jane Gregory was employed by Wexford as a nurse at NCCF. 381-2 ¶ 2. As a nurse, Nurse Gregory does not have the authority to order specific treatment or diagnose a patient. *Id.* ¶ 15.

Dr. Bruce Ippel was employed as a physician by Wexford at NCCF. 381-3 ¶ 2. However, in 2019 he retired, and no longer treats patients at NCCF. *Id.*

From August 27, 2018, through May 10, 2019, Dr. Mark Cabrera was employed by Wexford as a physician at NCCF. Dkt. 381-4 ¶ 2. Before Dr. Cabrera's time as an employee of Wexford, he also served as a locum tenens physician and occasionally would see patients at NCCF. *Id.*

Stacey Scott was an employee of Wexford at the relevant times. Dkt. 381-5 ¶ 1. Ms. Scott is currently employed as an Operations Consultant, but she has held a number of different positions since April 1, 2017. *Id.* One of Ms. Scott's responsibilities since April 1, 2017, has been to review and provide responses to the IDOC for medical grievances filed by inmates. *Id.* ¶ 2. Ms. Scott is not a medical provider and does not have the authority to diagnose a patient or order specific medical treatment. *Id.* ¶ 11.

Theresa Auler served as the Regional Manager for Wexford from April 8, 2018, to September 21, 2019. Dkt. 381-6 ¶ 1. Ms. Auler's duties as Regional Manager were primarily administrative in nature. *Id.* ¶ 2. At times, she would fill in and provide services as a Health Services Administrator (HSA) as necessary. *Id.* ¶ 3. For several months, Ms. Auler served as the HSA at NCCF. *Id.* ¶ 4. As the HSA, Ms. Auler would oversee medical care in the facility generally,

provide feedback to requests for information from IDOC or other staff regarding medical issues, respond to medical grievances that were forwarded to the medical office, and ensure compliance with IDOC Directives. *Id*.

Kelly Durm was employed as the HSA at NCCF from October 2017 through February 3, 2018. Dkt. 381-7 ¶ 1. Her job duties were primarily administrative in nature and involved oversight of the healthcare unit, review of correspondences and grievances that are medical in nature that were forwarded to the medical department for investigation and response, coordination of compliance with the Healthcare Directives, and other obligations and tasks, as necessary. *Id.* ¶ 2. Ms. Durm does not recall receiving any correspondence from Mr. Perry regarding his need for medical treatment. *Id*. ¶ 5. While Mr. Perry arrived at NCCF on or around January 10, 2018, Ms. Durm left her employment with Wexford just a few weeks later on February 3, 2018. *Id.* ¶ 6. Ms. Durm does not recall having any involvement in Mr. Perry's medical care while he was at NCCF. *Id.* ¶ 7.

Since July 1, 2018, Dr. Mitcheff has been employed by Wexford as the Regional Medical Director for the State of Indiana. Dkt. 381-8 ¶ 2. Dr. Mitcheff's job duties are primarily administrative in nature, although he does at times see patients as needed. *Id.* ¶ 3. One of Dr. Mitcheff's duties is to review requests from on-site practitioners for patients to receive off-site medical care, through a process called Utilization Management. *Id.* ¶ 4. Through this process, Dr. Mitcheff will discuss with on-site staff a patient's medical history, recommendations, and if necessary, alternative potential treatment plans. *Id.*

### 3. State Defendants

Robert Stafford is employed by the IDOC at the Correctional Industrial Facility as an Administrative Assistant. Dkt. 386-6, ¶ 2. In this position, he serves as an alternate Final

Reviewing Authority for Level II offender grievance appeals. *Id.* He is not a medical professional and does not prescribe medication or treat medical conditions and do not have any training in the medical field. *Id.* ¶ 4. He is not a medical provider and is not responsible for making medical decisions for any offender. *Id.* He relies on medical staff to make appropriate medical determinations for offenders. *Id.* ¶ 6.

Michael Smith is employed by the IDOC as a Health Services Quality Assurance Manager. Dkt. 386-5 ¶ 2. Mr. Smith is not a medical professional and does not prescribe medication or treat medical conditions. *Id.* ¶ 4. He does not have any medical training. *Id.* As a Health Services Quality Assurance Manager, it would have been improper for him to intervene and attempt to override the medical care determinations made by medical staff or other associated medical professional(s), unless the providers had failed to follow the appropriate medical protocol. *Id.* ¶ 10.

### 4. Correctional Facility Defendants

Keith Butts is the Warden of NCCF. *See* 391-3 ¶ 13.

At all relevant times, Jennifer Smith was a Grievance Specialist at NCCF. Dkt. 391-2 ¶ 4. In this role, Ms. Smith would review inmate grievances and log them into the IDOC Offender Grievance Review and Evaluation System. *Id.* If a grievance was deficient, she would not log it, but would return it to the inmate with information as to the grievance's deficiency. *Id.* ¶ 6, 11. When a medical issue was asserted in a grievance, Ms. Smith would contact the HSA and ask for a response. *Id.* She would then respond to the grievance based on the information from the HSA. *Id.* ¶ 6-8, 11. Ms. Smith is not medically trained and is not employed to provide medical services. *Id.* ¶ 7.

During the times relevant to the complaint, Myra Strobel was the Executive Assistant to the Warden, the Public Information Officer, the Litigation Liaison, and at times, served as the

Warden's designee at NCCF with respect to the administration of grievances. Dkt. 391-3 ¶ 3. Ms. Strobel is not medically trained and does not provide medical care to offenders. *Id.* ¶ 7. And she had no role in the placement of offenders in certain jobs or in distribution of food to offenders. Ms. Strobel participated in the grievance process, generally as part of the appeal process. *Id.* ¶ 9. Ms. Strobel states that offenders such as Mr. Perry may disagree with her appeal responses, but those actions did not impact her future review of grievances. *Id.* ¶ 10. Ms. Strobel was also involved in the evaluation of grievances filed by Mr. Perry that he designated as 'emergency grievances' and would deny the emergency status of the grievance, but still allow the grievance to proceed for review, if it did not indicate the existence of a substantial risk of injury or harm to Mr. Perry. *Id.* ¶ 11.

J. Nelson, also an employee at NCCF, would review grievances after the decision provided by Ms. Smith. *See* Dkt. 391-11 p. 1.

Shannon Heady was a Sergeant at NCCF during the relevant time. Dkt. 391-4 ¶ 3. K. Martin served as a Correctional Officer in the Restricted Housing Unit at NCCF. Dkt. 391-5 ¶ 3.

Mr. Perry alleged in the Amended Complaint that Thelma Nornes hired a detail worker on his unit who had previously threatened him and Captain Glenn Thompson ignored his complaints on this issue. Dkt. 95 p. 8.

**B. Mr. Perry's Medical Care**

On May 2, 2017, Mr. Perry saw Nurse Practitioner Jeffery Glover[1] in chronic care clinic at NCCF for his complaints of GERD. Dkt. 416-1 p. 1-4. NP Glover ordered labs. *Id.* According

---

[1] Mr. Perry calls this practitioner Dr. Jeffery Glover, but the medical records identify him as a nurse practitioner.

to the Anti-HCV test results, the test was positive for HCV antibodies and "[t]esting for HCV RNA [is] necessary to differentiate between acute and past HCV infection." *Id*. p. 5.

### 1. Treatment at WVCF in 2017

On August 22, 2017, Mr. Perry was transferred from NCCF to WVCF. Dkt. 381-1 ¶ 6; dkt. 381-10 p. 51. Nurse Amy Wright performed his intake screening. Dkt. 416-1 p. 10-18.

On September 6, 2017, Mr. Perry's labs were taken.[2] Dkt. 381-1 ¶ 7; dkt. 381-10 p. 50. According to the results, Mr. Perry's SGOT/AST[3] level was 137 and his SGOT/ALT level was 244. Dkt. 416-1 p. 23. According to the lab results, the normal range for SGOT/AST is 15-40 and for SGOT/ALT is 7-45. *See id.*

On November 2, 2017, Mr. Perry was assessed by Nurse Barbara Riggs, who discussed with him his prior lab results and an order to redraw the complete metabolic panel. Dkt. 381-1 ¶ 9; dkt. 381-10, p. 47. Labs were drawn on November 9, 2017. Dkt. 381-1 ¶ 10; Dkt. 381-10 p. 46.

On December 28, 2017, Dr. Byrd had his first evaluation with Mr. Perry since he had arrived at WVCF. Dkt. 381-1 ¶ 11; dkt. 381-10 p. 42-45.  Mr. Perry explained to Dr. Byrd that he was having episodes that felt like he was about to faint, and he believed that his blood sugar was low. *Id.* Dr. Byrd reviewed Mr. Perry's prior lab work, which returned with normal glucose levels of 87 and 88 during the prior lab draws in September and November 2017. *Id.* Dr. Byrd noted that

---

[2] The defendants state that these labs were drawn in preparation for an upcoming chronic care visit, while Mr. Perry asserts that they were ordered by NP Glover. The laboratory record indicates that NP Glover ordered the labs. Dkt. 416-1 p. 23.

[3] The SGOT test is a blood test that's part of a liver profile. It measures one of two liver enzymes, called serum glutamic-oxaloacetic transaminase. This enzyme is now usually called AST, which stands for aspartate aminotransferase. An SGOT test (or AST test) evaluates how much of the liver enzyme is in the blood. Healthline, *SGOT Test*, https://www.healthline.com/health/sgot-test#purpose (last visited Mar. 3, 2021). "If the results … are high, that means one of the organs or muscles containing the enzyme could be damaged. These include [the] liver, but also the muscles, heart, brain, and kidneys." *Id.*

some of his AST and ALT liver enzymes were abnormal. *Id.* Dr. Byrd states that Mr. Perry denied

any known history of Hepatitis. *Id.* But Mr. Perry asserts that on June 9, 2017, Dr. Byrd told him

that he had HCV. Dkt. 420 ¶ 2. Mr. Perry asked that his condition be "taken seriously." Dkt. 381-

1 ¶ 11; dkt. 381-10 p. 42-45.  Mr. Perry believed that his concerns were not being addressed

because he was incarcerated, but Dr. Byrd assured him this was not the case. Dkt. 381-1 ¶ 11; dkt.

381-10 p. 41.

Dr. Byrd's assessment was light-headedness with an unclear cause Dkt. 381-1 ¶ 11; dkt.

381-10 p. 42-45. Dr. Byrd ordered several labs, looking for any potential abnormalities that would

explain Mr. Perry's symptoms. Dkt. 381-1 ¶ 11; dkt. 381-10 p. 42-45.  Dr. Byrd ordered amylase

and lipase levels, to rule out potential chronic pancreatitis, as well as HCV antibody and Hepatitis

B surface antigen test with a sedimentation rate, as well as chest x-rays and an EKG. *Id.* He also

ordered a complete blood count, comprehensive metabolic panel, a folic acid, hemoglobin A1-C,

TSH and urinalysis as well as vitamin B-12. Dkt. 381-1 ¶ 11; dkt. 381-10 p. 42-45.  Dr. Byrd hoped

that this broad spectrum of testing would help rule out any potential causes for his symptoms and

put Mr. Perry at ease regarding his medical concerns. Dkt. 381-1 ¶ 11; dkt. 381-10 p. 42-45.  After

Dr. Byrd received these labs, on January 4, 2018, he ordered that Mr. Perry's blood sugar be

checked during insulin line. Dkt. 381-1 ¶ 12; dkt. 381-10 p. 41. To Dr. Byrd's knowledge, Mr.

Perry had not been previously diagnosed with HCV or any other liver disease before time at WVCF

in the fall of 2017. Dkt. 381-1 ¶ 15. Before Dr. Byrd was able to meet with Mr. Perry to discuss

the results of this testing, Mr. Perry transferred to NCCF. *Id.* ¶ 17.

Pursuant to IDOC policy, Dr. Byrd did not personally prescribe medication to treat HCV

because the treatment may differ based upon a patient's specific genotype of HCV. *Id.* ¶ 20. Before

Dr. Byrd was able to see Mr. Perry again, he transferred to NCCF on January 12, 2018. *Id.* ¶ 13; dkt. 381-10 p. 30.

### 2. Treatment at NCCF in 2018

Mr. Perry was transferred to NCCF on January 10, 2018. Dkt. 381-2 ¶ 4.

On January 12, 2018,[4] Nurse Gregory performed an initial intake assessment and questionnaire as required by IDOC procedure, of Mr. Perry. Dkt. 381-2 ¶ 6; dkt. 381-10, p. 26-39. This included a heat stress questionnaire, a flu screening form, a disability classification, and the standard IDOC intake questionnaire which includes information regarding HIV screening, current symptoms, allergies, drug abuse, suicide potential, PREA, and a questionnaire. *Id*. This process will often include a review of the available electronic medical records. *Id*. ¶ 7.  And it can involve a visual assessment and questions for the patient, as well as a number of forms that can be filled out either by the nursing staff or with the assistance of the individual. [5] *Id.* Nurse Gregory states that from a review of the electronic medical record, it appears that during this intake, Mr. Perry and Nurse Gregory completed all of the intake paperwork, which was uploaded and entered into the electronic system. *Id*. ¶ 8; dkt. 381-10 p. 26-39. Nurse Gregory recalls that Mr. Perry reported to her that he had been transported to NCCF as a punishment for a prior lawsuit he had filed. Dkt. 381-2 ¶ 9. Before this intake screening, Nurse Gregory does not remember any personal interaction with Mr. Perry. *Id.* ¶ 10. She had no prior knowledge or information regarding any grievances, lawsuits, or any other legal action that had been filed or taken by Mr. Perry. *Id.*

Nurse Gregory's electronic medical records note that Mr. Perry was complaining on January 12 of shortness of breath and a persistent cough, but during her assessment, it did not

[4] Mr. Perry asserts that his intake was done on January 11, 2018.
[5] Mr. Perry states that Nurse Gregory incorrectly entered information in the screening and had Mr. Perry fill out some of the forms on his own in violation of IDOC policy. Dkt. 419 p. 18-19.

appear that his shortness of breath or a cough was an emergent condition, as he was able to speak and communicate just fine. *Id.* ¶ 11; dkt. 381-10 p. 26-39. Nurse Gregory does not specifically recall Mr. Perry asking for any medical attention during this visit, but most often, unless a patient has an emergent or immediate medical need, she will advise them to submit a health care request, and also advise them that pursuant to policy, patients are normally seen by a practitioner within seven days of their arrival at the facility, and they can bring up their complaints to the practitioner during that visit. *Id.* ¶ 12. Mr. Perry testifies that Nurse Gregory told him upon intake that "if I do not stop complaining then I will not receive my medications because I made some big people at Central Office mad with my lawsuits." Dkt. 420 ¶ 3.

On January 16, 2018, Mr. Perry submitted a request for health care complaining of trouble breathing. Dkt. 416-1 p. 143. Dr. Ippel first interacted with Mr. Perry on January 19, 2018, during a provider visit. Dkt. 381-3 ¶ 7; dkt. 381-10 p. 23-24. At that time, Mr. Perry explained to Dr. Ippel his belief that he had an allergy to the metal in the handcuffs and shackles that were used by security staff. *Id.* He was also complaining of some intermittent shortness of breath, which did not appear to Dr. Ippel to be cardiac in nature. *Id.* Mr. Perry states that Dr. Ippel did not address his complaints of chest pain and shortness of breath. Dkt. 416-1 p. 593-94; dkt. 419 p. 37. Dr. Ippel's assessment was contact dermatitis and/or eczema, and he ordered a number of labs including a HCV antibody, Hepatitis B antibody, a complete blood count, comprehensive metabolic panel, iron level, hemoglobin, A1-C, a lipid panel, a urinalysis, and TSH. Dkt. 381-3 ¶ 7; dkt. 381-10 p. 23-24.

Mr. Perry asserts that he had another asthma attack on January 21, 2018, and he filed a grievance about it. Dkt. 416-1 p. 146. The grievance states the he told Nurse Gregory that he was having trouble breathing and she told him that it was Sunday and she takes it easy on Sunday. Dkt.

416-1 p. 146. Nurse Gregory does not recall any interaction with Mr. Perry on or around January 21, 2018. Dkt. 381-2 ¶ 17. None of Mr. Perry's medical records from January 21, 2018, or the following days, indicate that Mr. Perry was suffering from any medical emergency, or significant medical event. *Id.* And there is no indication from the records that custody staff ever called a signal 3000, which indicates a medical emergency. *Id.*

Mr. Perry was seen at nursing sick call on February 24, 2018, by Melanie Johnson. Dkt. 416-1 p. 154. The nurse noted white scaly patches on the back of his tongue. *Id.* p. 155. Mr. Perry was seen by Nurse Johnson for trouble breathing on February 25, 2018. Dkt. 416-1 p. 157.

Mr. Perry saw Dr. Alexander Platz on February 27, 2018, for a chronic care visit regarding GERD and shortness of breath. Dkt. 381-1 ¶ 8; dkt. 381-10 p. 20-21. Dr. Platz prescribed Benadryl, an inhaler, and breathing treatments as needed. *See* dkt. 416-1 p. 166.

On March 9, 2018, Mr. Perry alleges that defendant Gaddis denied him a breathing treatment because he said he was going to file a grievance. Dkt. 416-1 p. 169. Mr. Perry grieved the issue and Lieutenant Gard responded to Ms. Smith's request for a response stating:

> Everything Offender Perry #138925 said in his grievance is true. However what Perry fails to mention is, Perry did receive a breathing treatment after our conversation at 0535 hours. I myself took him to the medical office for his treatment. I spoke to Officer Gaddis about his action and he said "okay." I don't believe we will have this issue again with Gaddis.

*Id.*

On March 22, 2018, Mr. Perry's blood was drawn for labs. Dkt. 416-1 p. 581-83. There were three abnormal results. *Id.* p. 582 (SGOT/AST – 80; SGPT/ALT – 199; Triglycerides – 162). His results from the Indiana State Department of Health Laboratories showed HCV antibodies. Dkt. 416-1 p. 213.

On April 4, 2018, Mr. Perry was assessed by Dr. Kenneth Robertson regarding a complaint of back pain as well as questions about Hepatitis. Dkt. 381-3 ¶ 8; dkt. 381-10 p. 17-19.

On July 6, 2018, Dr. Cabrera examined Mr. Perry regarding HCV and prescribed Naproxen for a report of back pain. Dkt. 381-3 ¶ 14; dkt. 381-4 ¶ 4, dkt. 381-10 p. 8-9. Mr. Perry reported shortness of breath, as well as back pain. Dkt. 381-4 ¶ 4; dkt. 381-10 p. 8-9. Mr. Perry states that Dr. Cabrera did not address his complaints of chest pain and shortness of breath. Dkt. 419 p. 36. Dr. Cabrera noted that Mr. Perry was a carrier of the Hepatitis B virus (with no apparent symptomology or active disease process), and HCV positive.[6] Dkt. 381-4 ¶ 4; dkt. 381-10 p. 8-9. Dr. Cabrera reviewed his lab work and noted his current APRI score[7] was 1.74. *Id.* Dr. Cabrera requested a liver ultrasound. Dkt. 386-1 p. 1-2. Due to Mr. Perry's complaint of back pain, Dr. Cabrera prescribed Naproxen for 28 days, as that was allowed per IDOC policy, and noted that in his opinion the shortness of breath was most likely associated with anxiety, as it did not appear to be debilitating or lead to any instability in his vitals. Dkt. 381-4 ¶ 4; dkt. 381-10 p. 8-9. It is Dr. Cabrera's understanding that Mr. Perry later filed a grievance regarding this prescription of Naproxen, arguing that it was improper given his HCV. Dkt. 381-4 ¶ 5. While at times, patients may need to avoid anti-inflammatories, the prescription of Naproxen was relatively low dose and for a short period of time and Dr. Cabrera did not believe it would be problematic. *Id.*

---

[6] Mr. Perry argues that this is a misdiagnosis because the necessary HCV RNA test had not been completed. Dkt. 416-1 p. 69. Mr. Perry says in response to his interrogatory on this point, Dr. Cabrera stated that the test is not necessary to determine between an acute and past infection. Dkt. 416-1 p. 246.

[7] An APRI score is a mathematical formula that allows physicians to monitor the progression of liver enzyme abnormalities, as well as other levels, through a patient's blood test results, which can provide an indication regarding progression of HCV without the need for invasive imaging or a biopsy. APRI scores are recommended for monitoring and prioritization of treatment in the Federal Bureau of Prisons Guidelines, as well as IDOC Healthcare Service Directives. Dkt. 381-8 ¶ 7.

On July 10, 2018, Dr. Mitcheff participated in a collegial call discussion with Dr. Ippel regarding the request for Mr. Perry to receive a liver ultrasound. Dkt. 381-8 ¶ 6. During this call, they discussed Mr. Perry's test results, including his APRI score. *Id.* Mr. Perry's APRI score was 1.74 which is elevated, and indicative of a patient with chronic HCV. Dkt. 381-8 ¶ 8. However, based upon their discussion and review of the records, Dr. Mitcheff testifies that there did not appear to be any symptomology or condition present that required an ultrasound. *Id.* Dr. Mitcheff indicated to Dr. Ippel that they could rediscuss as clinically necessary, and to follow-up in six months. *Id.* ¶ 9. At that time, discussions were ongoing with IDOC regarding changes to IDOC's Healthcare Services Directives for the treatment of HCV, including for the prescription of direct acting anti-virals as a treatment for chronic Hepatitis C. *Id.* ¶ 10. Dr. Mitcheff states that his recommendation and discussion with Dr. Ippel were not based on any prior lawsuits, but instead, was based upon his medical opinion and judgment, based upon a discussion with Dr. Ippel and a review of the relevant medical records and lab testing. *Id.* ¶ 11.

On August 5, 2018, Mr. Perry's blood test results revealed abnormal results for SGOT/AST (105) and SGPT/ALT (209). Dkt. 416-1 p. 314.[8]

On August 24, 2018, Mr. Perry was again evaluated by Dr. Cabrera in which they discussed HCV[9] and Dr. Cabrera ordered labs for Hepatitis B Surface Antigen/Hepatitis B Surface Antibody, and Hep C AB. Dkt. 381-4 ¶ 6; dkt. 381-10 p. 5-7. Dr. Cabrera specifically went over Mr. Perry's symptoms, and noted he denied any bleeding, bruising, pruritus, night sweats or fever, but was reporting that he could feel his liver and was having some lethargy. *Id.* Dr. Cabrera did not notice

---

[8] There were also abnormal results for red blood cells, MPV, hemoglobin, and hematorcrit. Dkt. 416-1 p. 314.

[9] Mr. Perry states that Dr. Cabrera did not discuss HCV with him, but just talked about Hepatitis B. Dkt. 416-1, p. 364.

14

any signs of jaundice or abdominal abnormalities. *Id.* Dr. Cabrera also reviewed Mr. Perry's medical history and his recent lab notes, noting he had a prior notation of a Hepatitis B carrier that had appeared to have been resolved, as well as a diagnosis of HCV.[10] *Id.* Dr. Cabrera ordered additional lab testing given Mr. Perry's complaints, specifically Hepatitis B testing, as Mr. Perry was certain he did not have Hepatitis B. *Id.* Dr. Cabrera also ordered a HCV antibody test, and given his ongoing complaints of discomfort, he prescribed Mobic, which is another form of anti-inflammatory medication, for his symptoms. *Id.* According to Dr. Cabrera's review of the records, he did not have any further interaction or assessments with Mr. Perry. Dkt. 381-4 ¶ 7; dkt. 381-10 p. 1.

During Dr. Cabrera's assessments, treatment for HCV in the IDOC was primarily managed and controlled by IDOC Healthcare Directives, and a specific prescription of medication was handled outside of the facility. Dkt. 381-4 ¶ 11. Pursuant to this policy, Dr. Cabrera did not have the authority to order a medication such as direct acting antivirals for HCV. *Id.* This directive required the use and monitoring of the patient's enzyme and blood results through the APRI score. *Id.* ¶ 10.

According to the records, Mr. Perry was scheduled for another physician visit on or around November 6, 2018 but was unable to be brought to the healthcare unit due to a security issue in the O Unit, and as such he was to be rescheduled. Dkt. 381-3 ¶ 16; dkt. 381-10 p. 4.

### 3. Return to WVCF

Mr. Perry transferred from NCCF to WVCF on December 20, 2018. Dkt. 381-3 ¶ 18; dkt. 381-10 p. 1.

---

[10] Mr. Perry again states that this is a misdiagnosis because he had not had the HCV RNA test.

Mr. Perry had a positive HCV RNA test on April 19, 2019. Dkt. 416-1 p. 119. At some point in 2019, Mr. Perry was prescribed and received a full course of direct acting anti-viral medication and he is now cured. Dkt. 381-8 ¶ 12. In Dr. Mitcheff's most recent review of Mr. Perry's records, all of his liver function is normal. *Id.* Dr. Mitcheff testifies that the reason for an ultrasound is to rule out hepatocellular carcinoma in someone with advanced liver disease and there is no evidence of any liver disease here. *Id.* ¶ 13. Dr. Mitcheff concludes that an ultrasound was, and is, unnecessary. *Id.* ¶ 13.

### B. Mr. Perry's Complaint of Mold in His Cell

On June 21, 2018, Mr. Perry filed a grievance asserting that the vent in his cell was covered in black mold. Dkt. 416-1 p. 219. Ms. Smith sought and received information from Sanitation Supervisor Todd Thibeault and Ms. Heady. *Id.* p. 223. Their responses were emailed to Ms. Smith and Thelma Nornes. *Id.* Ms. Smith responded to the grievance:

> According to Sanitation Supervisor Theibeault what is on the vent is the (powdered) milk and other substances that inmates use to adhere paper to the vent to block it off. This is not mold.
>
> Sgt. Heady reports that there is milk, paper and toilet paper that has been stuck on the vent. Offenders are given items to clean their cells every Friday. On 8/31/18, you were offered cleaning supplies and refused to clean your cell. There shouldn't be any mold in their cells/vents if they are cleaning them.
>
> Based on the above information offenders are responsible for cleaning their cells, this includes the vents. On multiple occasions you have been given the opportunity and supplies necessary to clean your cell. The substance on your vent or coming out of your vent is not black mold. It appears that If you were so concerned for your health and safety you would have taken it upon yourself and cleaned the vent/cell to meet your standards. If you have not chosen to clean the vent then that is on you. Your grievance issue has been addressed and no further relief can be offered.

Dkt. 416-1 p. 222.

### C. Grievances

Mr. Perry filed several grievances regarding his medical care and his conditions of confinement.

### 1. Medical Grievances

*Shortness of Breath*

Mr. Perry filed a grievance on January 21, 2018, alleging that Nurse Gregory denied him medical attention for chest pains and shortness of breath. Dkt. 416-1 p. 146.  On or around February 1, 2018, Ms. Smith contacted Ms. Auler regarding this grievance. Dkt. 381-6 ¶ 5; dkt. 381-11 p. 5. Ms. Auler reviewed the medical records, noting that Mr. Perry had recently been seen by Dr. Ippel, and also spoke with Nurse Gregory. Dkt. 381-6 ¶ 6; dkt. 381-11 p. 5. Ms. Auler noted that Mr. Perry had been assessed during an initial intake on January 12, 2018, and by the medical provider on January 19, 2018. Dkt. 381-6 ¶ 7; dkt. 381-11 p. 1. Ms. Auler also noted that she had spoken with Nurse Gregory regarding Mr. Perry's allegations and determined that Mr. Perry had not expressed concerns of an urgent medical matter. *Id.* Mr. Perry's grievance was denied on February 20, 2018. Dkt. 381-11 p. 1. It did not appear to Ms. Auler based on her review of the medical records and her discussion with Nurse Gregory that Mr. Perry was suffering from a medical emergency that required immediate medical attention. Dkt. 381-6 ¶ 9. Mr. Perry filed a grievance appeal and Ms. Strobel denied the appeal. Dkt. 416-1 p. 145.

*Hepatitis B*

On February 15, 2018, Mr. Perry filed a grievance asking to be treated for Hepatitis B. Dkt. 416-1 p. 127. Ms. Smith returned the grievance because it had been submitted too late and he had not shown good reason for the delay. *Id.* p. 128.

*Visit with Dr. Cabrera*

Mr. Perry filed a grievance on July 15, 2018, regarding his July 6, 2018 appointment with Dr. Cabrera and asking to be tested for Hepatitis A. Dkt. 416-1 p. 253. Ms. Scott responded to the grievance:

> You were seen on 7618 and as a result of this evaluation your case was presented to a collegial panel of providers to determine if a liver ultrasound was needed at this time. Based on your clinical condition and lab results no liver ultrasound is clinically indicated at this time. Your condition and lab levels will be reevaluated in 6 months. Hepatitis management guidelines are being followed at this time.

Dkt. 416-1 p. 254.

Mr. Perry appealed the denial of the grievance, and his appeal was forwarded to Robert Stafford, who referred the grievance to Michael Smith. Dkt. 386-3; dkt. 386-4. Mr. Perry's appeal was denied. On September 28, 2018, Mr. Smith stated:

> After review of the medical record, the facility response is accurate and appropriate at this time. You have been seen and continue to be seen for the concerns that you have addressed and the providers have followed appropriate medical protocol with regard to your treatment.  Your treatment plan is specific and is determined on an individual basis with regard to your care. Should you have questions, you should address with the provider on site; she will address your concerns.

Dkt. 416-1 p. 254. Mr. Stafford stated: "Your appeal was referred to the Division of Clinical Health Care Services for review. In consultation with Department medical personnel, your records have been reviewed and care is appropriate at this time." *Id.*

### *Pain Medication*

On or around July 27, 2018, Mr. Perry submitted a grievance regarding the pain medication Dr. Cabrera prescribed during the July 20, 2018 visit, stating his concern that the medication would be bad for his liver and stating that he had requested Tramadol instead. Dkt. 381-11 p. 10. Ms. Smith contacted Ms. Scott on August 10, 2018. Dkt. 381-5 ¶ 6; dkt. 381-11 p. 10. Ms. Scott coordinated with medical staff at the facility and was notified that Dr. Cabrera was aware of Mr. Perry's conditions and risk factors but decided not to prescribe Tramadol was because Tramadol

18

is a narcotic type medication with highly addictive properties. Dkt. 381-5 ¶ 7; dkt. 681-11 p. 10. Ms. Scott is not a medical provider, and as such, she does not have the authority to order specific medical treatment or diagnose a patient. Dkt. 381-5 ¶ 11. She does have the authority to ensure that a patient has access to the care the he or she needs. *Id.* ¶ 12.

*Inhaler*

On March 13, 2018, Mr. Perry filed a grievance stating that he had an allergic reaction to his inhaler. Dkt. 416-1 p. 206. Ms. Smith returned the grievance because there was no indication he attempted to informally resolve his complaint. *Id.* p. 207. On April 23, 2018, Mr. Perry received a response stating "According to Ms. Auler, Wexford Medical you were ordered Zyrtec for allergies on 3/21/18. This medication would assist with the symptoms you were describing in this grievance." *Id.* p. 208.

**2. Other Grievances**

Mr. Perry filed a grievance on March 26, 2018, alleging that his grievance process had been denied. Dkt. 416-1 p. 184. Ms. Smith returned the grievance stating "your relief is already being provided." *Id.* p. 185.

On June 30, 2018, Mr. Perry filed a grievance, labeled an emergency, asserting that the vent in his cell was covered in black mold. Dkt. 416-1 p. 219. Ms. Smith returned the grievances asking Mr. Perry: "were you given or did you request cleaning supplies to address this?" *Id.* p. 224. Ms. Heady emailed Ms. Smith stating "It's milk, toilet paper, paper. They are giving items to clean the cells every Friday so they shouldn't have any mold in their cells." *Id.* p. 223. Todd Thibeault stated: "What is on the vent is milk and other items the inmates use when they block them. There is no mold inside the vent. If somebody could take a photo and send it I will be happy to assist in

identifying the issue. Like Robinson we have been down to that location and that was our findings."

*Id.*

> According to Sanitation Supervisor Thibeault what is on the vent is the (powdered) milk and other substances that inmates use to adhere paper to the vent to block it off. This is not mold.
>
> Sgt. Heady reports that there is milk, paper and toilet paper that has been stuck on the vent. Offenders are given items to clean their cells every Friday. On 8/3/18, you were offered cleaning supplies and refused to clean your cell. There shouldn't be any mold in their cells/vents if they are cleaning them.
>
> Based on the above information offenders are responsible for cleaning their cells, this includes the vents. On multiple occasions you have been given the opportunity and supplies necessary to clean your cell. The substance on your vent or coming out of your vent is not black mold.

Dkt. 416-1 p. 220. Mr. Perry appealed stating that he cannot clean the inside of the vent. *Id.* p. 221.

Ms. Strobel agreed with the response provided. *Id.* p. 221.

In August 2018, Mr. Perry filed a grievance stating that, in front of Sergeant Heady, another offender had threatened to put bodily fluids in his food. Dkt. 391-12 p. 13. He further stated that he was afraid to eat his food. *Id.* Ms. Smith returned the grievance stating that there was no indication that Mr. Perry attempted to informally resolve his complaint and stating "Custody staff are right there with offenders when food is passed. How can body fluids be introduced into your food?" *Id.* p. 14. She later responded to the grievance stating that Sergeant Heady was not on duty on the date referenced in the grievance and that there is no offender with the name identified in the grievance. *Id.* p. 6. She also explained that "it appears that food trays are escorted by staff and placed in the cuff port by the offender. Your grievance relief to not be forced to eat from inmates is your choice." *Id.* Mr. Perry appealed, explaining that he mistakenly identified the date of the incident and the name of the offender who had threatened him. *Id.*, p. 4-5. Ms. Nelson denied the appeal, agreeing with the response provided. *Id.* p. 4. Ms. Heady testifies that she was not on duty

on the date alleged in the grievance, but that she recalls that Mr. Perry and the other offender did

not get along and she "did provide commands for them to remain separated." Dkt. 391-4 ¶ 7.

### III. Discussion

#### A. Legal Claims

##### 1. Eighth Amendment Medical Care

Mr. Perry asserts Eighth Amendment medical care claims against the defendants. At all

times relevant to his claims, he was a convicted offender. Accordingly, his treatment and the

conditions of his confinement are evaluated under standards established by the Eighth

Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v.*

*McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison

and the conditions under which he is confined are subject to scrutiny under the Eighth

Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane

conditions of confinement, meaning, they must take reasonable measures to guarantee the safety

of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care.

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate

indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an

objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition

and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel.*

*Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"To determine if the Eighth Amendment has been violated in the prison medical context,

[courts] perform a two-step analysis, first examining whether a plaintiff suffered from an

objectively serious medical condition, and then determining whether the individual defendant was

deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation omitted). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### 2. Medical Malpractice

To make a successful negligence claim, Mr. Perry must establish: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) any injury proximately caused by the breach of that duty. *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991). In the context of professional malpractice, he must also show that the breach of any duty was caused by the defendant allowing their care and treatment to fall below a set standard of care. *Perry v. Driehorst,*

808 N.E.2d 765, 768 (Ind. Ct. App. 2004). The standard of care is defined as "that degree of skill and care ordinarily possessed and exercised by a reasonably careful, skillful and prudent practitioner in the same class to which he/she belongs treating such formalities under the same or similar circumstances." *Id.* In the case of professional malpractice, the plaintiff must usually provide expert testimony. *Id.*

### 3. Retaliation

To prevail on a First Amendment retaliation claim, Mr. Perry must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017) (internal citations omitted).

### 4. Conditions of Confinement

To prevail on a claim alleging unconstitutional conditions of confinement, Mr. Perry must show two elements:

> first, an objective showing that the conditions are sufficiently serious—*i.e.*, that they deny the inmate the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety—and second, a subjective showing of a defendant's culpable state of mind.

*Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017) (internal citations and quotation omitted).

### B. Discussion

### **The Medical Defendants**

### 1. Dr. Byrd

Mr. Perry's claim against Dr. Byrd is that Dr. Byrd was deliberately indifferent to his liver condition. He also alleges that Dr. Byrd retaliated against him.

*Deliberate Indifference*

23

Dr. Byrd saw Mr. Perry on December 28, 2017. Dkt. 381-1 ¶ 11; dkt. 381-10 p. 42-45. Mr. Perry told Dr. Byrd that he was having episodes that felt like he was about to faint and that his blood sugar was low. *Id.* Dr. Byrd ordered a number of labs, including labs to check amylase and lipase levels for pancreatitis, HCV and Hepatitis B, as well as a sedimentation rate, chest x-ray and EKG, in addition to a complete blood count, comprehensive metabolic panel, folic acid, hemoglobin A1-C, TSH, urinalysis and Vitamin B-12. Dkt. 381-10 p. 44. Dr. Byrd testifies that this broad spectrum of testing was to rule out any potential causes of his symptoms and to put Mr. Perry at ease regarding his medical concerns. *Id.* Dr. Byrd testifies that after he received the labs, on January 4, 2018, he ordered that Mr. Perry's blood sugar be checked during insulin line. Dkt. 381-1 ¶ 12; dkt. 381-10 p. 41. However, before Dr. Byrd could see Mr. Perry to discuss the results of any labs or testing, Mr. Perry was transferred to NCCF on or around January 10, 2018.

Here the parties do not dispute that an HCV infection is a serious medical need. But there is a dispute of fact regarding whether Dr. Byrd was deliberately indifferent to Mr. Perry's HCV infection. When Mr. Perry first saw Dr. Byrd, he had already had a positive HCV antibody test result, which indicated that "[t]esting for HCV RNA is necessary." 416-1 p. 5. Mr. Perry also had lab results from September 7, 2017, showing abnormal liver enzyme levels. Dkt. 416-1 p. 22-24. It is therefore unclear why Dr. Byrd re-ordered HCV antibody testing, rather than reviewing the previous test and ordering further testing or requesting treatment for Mr. Perry. Further, Dr. Byrd testifies that he reviewed Mr. Perry's lab results and ordered his blood sugar to be checked during insulin line. But Dr. Byrd apparently took no further action regarding Mr. Perry's HCV antibody or liver enzyme test results. A reasonable jury considering these facts might find Dr. Byrd was not deliberately indifferent to Mr. Perry's liver condition because he considered Mr. Perry's complaints and ordered testing. On the other hand, while it is a close call, a reasonable jury might conclude

24

that Dr. Byrd was aware of a risk to Mr. Perry in the form of an HCV infection, but took no action to further diagnose or treat it and therefore failed to exercise medical judgment or was criminally reckless. *See Board*, 394 F.3d at 478. As another judge of this Court held, "there is no reason to delay HCV treatment." *Stafford v. Carter*, No. 1:17-cv-280-JMS-MJD, 2018 WL 4361639, *17 (S.D. Ind. Sept. 13, 2018). Dr. Byrd therefore is not entitled to summary judgment on Mr. Perry's deliberate indifference claim.

### Retaliation

Mr. Perry has pointed to no evidence that Dr. Byrd was aware of or involved in any prior litigation or grievances before he treated him in 2017. Because Mr. Perry has designated no evidence that Dr. Byrd was even aware of any grievances or complaints, Dr. Byrd is entitled to summary judgment on the retaliation claim. *See Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) ("vague and confusing testimony" that the plaintiff named the defendant at some point in a grievance with no evidence that the defendant even knew about it was not enough to support a retaliation claim). Dr. Byrd is therefore entitled to summary judgment on any retaliation claim.

### 2. Nurse Gregory

Mr. Perry sues Nurse Gregory for deliberate indifference to his liver condition, chest pain, trouble breathing, and throat bumps. He also stated a malpractice claim against her. Finally, Mr. Perry alleges that Nurse Gregory retaliated against him.

### Deliberate Indifference

Nurse Gregory performed an intake screening of Mr. Perry when he arrived at NCCF.[11] Dkt. 381-2 ¶ 6; dkt. 381-10, p. 26-39. At this time, Mr. Perry complained of shortness of breath

---

[11] To the extent Mr. Perry alleges that Nurse Gregory was deliberately indifferent when she had him fill out a medical history questionnaire, she is entitled to summary judgment. He does not explain how doing so represented indifference to any of his serious medical needs.

and a persistent cough. Dkt. 381-2 ¶ 11; dkt. 381-10 p. 26-39. Nurse Gregory testifies that unless a patient has an emergent condition, she would advise him to submit a healthcare request and that, pursuant to policy, he will be seen within seven days of arrival. Dkt. 381-2 ¶ 12. Mr. Perry did see Dr. Ippel on January 19, 2018, and it was not noted that he had no emergent or serious medical abnormality, but Dr. Ippel did note that Mr. Perry complained of chest pain and shortness of breath. Dkt. 381-10 p. 23.

Mr. Perry also alleges that, on January 21, 2018, he asked Nurse Gregory for assistance because he was having shortness of breath. Nurse Gregory does not recall any interaction with Mr. Perry on or around January 21, 2018. Dkt. 381-2 ¶ 17.

Nurse Gregory argues that she is entitled to summary judgment on Mr. Perry's deliberate indifference claims because, even assuming that Mr. Perry complained to her of shortness of breath, this did not amount to a serious medical need. The Seventh Circuit has held that "shortness of breath and headaches are not serious enough to implicate the Eighth Amendment" *Bates v. Sullivan*, 6 Fed. App'x 425, 428 (7th Cir. 2001) (citing *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). Because simple shortness of breath is not a serious medical need, Nurse Gregory is entitled to summary judgment on deliberate indifference claims. Further, Mr. Perry points to no evidence regarding any treatment or lack of treatment Nurse Gregory gave him for his liver condition or bumps in his throat, so she is entitled to summary judgment on this claim as well.

*Medical Malpractice*

Nurse Gregory also seeks summary judgment on Mr. Perry's medical malpractice claims. First, Nurse Gregory points out that Mr. Perry has not presented any evidence to establish the applicable nursing standard of care, nor any deviation from the applicable standard of care. Moreover, as it deals with treatment for a liver condition, Mr. Perry cannot establish a malpractice

claim against Nurse Gregory, as she was a nurse and did not have the authority to order specific treatment or diagnosis a patient. Because Mr. Perry has not provided evidence regarding the applicable nursing standard of care or that Nurse Gregory could have treated his liver condition, she is entitled to summary judgment on his medical malpractice claim. *See Perry,* 808 N.E.2d at 768.

*Retaliation*

Nurse Gregory also seeks summary judgment on Mr. Perry's retaliation claim. Mr. Perry asserts that Nurse Gregory told him upon intake that "if I do not stop complaining then I will not receive my mediations because I made some big people at Central Office mad with my lawsuits." Dkt. 420 ¶ 3. "The Constitution prevents governmental actors from forbidding, or penalizing, speech that is protected under the first amendment." *Fairley v. Andrews*, 578 F.3d 518, 525. And "threats of penalties are also forbidden." *Id.* A reasonable jury who believed Mr. Perry's account might conclude that Nurse Gregory threatened him with punishment in the form of denial of medical care if he continued filing lawsuits and grievances. She is therefore not entitled to summary judgment on Mr. Perry's retaliation claim.

### 3. Dr. Ippel

Mr. Perry's claims against Dr. Ippel are that Dr. Ippel was deliberately indifferent to his liver condition, chest pains, trouble breathing, and throat bumps. Mr. Perry also stated medical malpractice claims against Dr. Ippel and claims of retaliation.

*Deliberate Indifference*

Dr. Ippel first interacted with Mr. Perry on January 19, 2018, during a provider visit. Dkt. 381-3 ¶ 7; dkt. 381-10 p. 23-24. Dr. Ippel evaluated Mr. Perry for his concern that he had an allergy to the metal in the handcuffs used by corrections staff. *Id.* Mr. Perry also complained of some

27

intermittent shortness of breath that Dr. Ippel concluded was not cardiac in nature. *Id.* Mr. Perry states that Dr. Ippel did not address his complaints of chest pain and shortness of breath, did not check his vitals, listen to his heart, listen to his lungs, or perform an EKG or spirometry. Dkt. 416-1 p. 593-94; dkt. 419 p. 37. Dr. Ippel ordered several labs including HCV antibody, Hepatitis B antibody, as well as a complete blood count, comprehensive metabolic panel, iron level, hemoglobin, A1-C, and a lipid panel, as well as a urinalysis and TSH. Dkt. 381-3 ¶ 7; dkt. 381-10 p. 23-24.

Dr. Ippel argues that he is entitled to summary judgment on Mr. Perry's deliberate indifference claim because he assessed Mr. Perry's complaints and ordered labs. Dr. Ippel points out that there is no evidence that Mr. Perry had previously been diagnosed with HCV and concludes therefore that he cannot have been deliberately indifferent to that condition. But, as with this claim against Dr. Byrd, Mr. Perry had already tested positive for HCV antibodies before this visit with Dr. Ippel. Mr. Perry also had lab results from September 7, 2017, showing abnormal liver enzyme levels. Dkt. 416-1 p. 22-24. It is therefore unclear why Dr. Ippel re-ordered HCV antibody testing, rather than considering the previous test and ordering further testing. As with Dr. Byrd, a reasonable jury may or may not conclude that Dr. Ippel was deliberately indifferent when he did not pursue treatment for Mr. Perry's HCV infection. Dr. Ippel is therefore not entitled to summary judgment on Mr. Perry's deliberate indifference claim based on Dr. Ippel's evaluation of his HCV.

Dr. Ippel also argues that he was not deliberately indifferent to Mr. Perry's throat bumps and shortness of breath because when he met with Mr. Perry, he noted these symptoms and ordered testing. While Mr. Perry asserts that Dr. Ippel did not check his vitals, Dr. Ippel testifies that Mr. Perry's complaints did not appear to be cardiac in nature. Dkt. 381-3 ¶ 7. Mr. Perry argues that Dr.

Ippel should have known that Dr. Byrd ordered an EKG while Mr. Perry was at NCCF and it had not been performed although IDOC policy requires that an "offender shall receive necessary health services which were planned or initiated at the previous facility in a continuous manner." Dkt. 416-1 p. 27. But even a disagreement between doctors does not amount to deliberate indifference. *Pyles*, 771 F.3d at 409. Dr. Ippel points out that Mr. Perry has not been diagnosed with any significant or serious cardiac abnormality that an EKG at this time would have revealed.

There is no evidence that Dr. Ippel disregarded Mr. Perry's complaints and Mr. Perry has never been diagnosed with cancer or any other disease related to bumps in his throat or on his body. He also has not been diagnosed with any serious cardiac condition. Dr. Ippel is entitled to summary judgment on Mr. Perry's deliberate indifference claims based on his claims of throat bumps and shortness of breath.

*Medical Malpractice*

Dr. Ippel also seeks summary judgment on Mr. Perry's medical malpractice claims. Dr. Ippel argues that Mr. Perry has not presented any evidence to establish the standard of care, nor any deviation from the applicable standard of care by Dr. Ippel. Mr. Perry points to BOP treatment guidelines which recommend baseline laboratory tests, including "complete blood count (CBC); prothrombin time with International Normalization Ration (INR); liver panel…and calculated glomerular filtration rate (GFR)." *See* Dkt. 416-1 p. 65. These guidelines also recommend "quantitative HCV RNA viral load testing." *Id.* A reasonable jury considering that Dr. Ippel did not order these tests might conclude that he was negligent. However, Mr. Perry has not presented evidence of the standard of care or that he was Dr. Ippel's treatment decision proximately caused him any injury. *See Webb,* 575 N.E.2d at 995. Indeed, Mr. Perry stands cured with no evidence of liver disease, but rather exhibits normal liver function. So, there is no injury, much less one that

29

can be shown to be proximately caused by any breach of duty by Dr. Ippel. Dr. Ippel is therefore entitled to summary judgment on Mr. Perry's medical malpractice claim.

### Retaliation

Dr. Ippel seeks summary judgment on Mr. Perry's retaliation claim because there is no evidence that he was aware of any prior grievance or lawsuit by Mr. Perry. Because Mr. Perry has designated no evidence that Dr. Ippel was aware of any grievances or complaints, Dr. Ippel is entitled to summary judgment on the retaliation claim. *See Daugherty*, 906 F.3d at 610.

### 4. Dr. Cabrera

Mr. Perry's claims against Dr. Cabrera are deliberate indifference and medical malpractice claims related to his liver condition and retaliation.

### Deliberate Indifference

Dr. Cabrera examined Mr. Perry on July 6, 2018, regarding HCV and prescribed Naproxen for a report of back pain. Dkt. 381-3 ¶ 14; dkt. 381-4 ¶ 4, dkt. 381-10 p. 8-9. Dr. Cabrera reviewed his lab work, noted his current APRI score was 1.74 and requested a liver ultrasound. Dkt. 386-1 p. 1-2. Dr. Cabrera again evaluated Mr. Perry on August 24, 2018, and ordered labs for Hepatitis B Surface Antigen/Hepatitis B Surface Antibody, and Hep C AB. Dkt. 381-4 ¶ 6; dkt. 381-10 p. 5-7. Dr. Cabrera specifically reviewed Mr. Perry's symptoms, and noted he denied any bleeding, bruising, pruritus, night sweats or fever, but was reporting that he could feel his liver and was having some lethargy. *Id.* Dr. Cabrera did not notice any signs of jaundice or abdominal abnormalities. *Id.* Dr. Cabrera ordered an HCV antibody test. *Id.*

Dr. Cabrera is not entitled to summary judgment on Mr. Perry's deliberate indifference claim. While Dr. Cabrera initially requested a liver ultrasound, the second time he saw Mr. Perry, he again ordered an HCV antibody testing. As with Drs. Byrd and Ippel, a reasonable jury

considering that Dr. Cabrera only ordered tests that had already been performed and returned positive results might or might not conclude that Dr. Cabrera was deliberately indifferent to a serious risk of harm to Mr. Perry.

*Retaliation*

Like Drs. Byrd and Ippel, Dr. Cabrera is entitled to summary judgment on Mr. Perry's retaliation claim because Mr. Perry has designated no evidence that Dr. Ippel was aware of any grievances or complaints. *See Daugherty*, 906 F.3d at 610.

**5. Ms. Scott**

Mr. Perry's claims against Ms. Scott are that she was deliberately indifferent to his liver condition and that she retaliated against him for filing grievances. Ms. Scott seeks summary judgment arguing that she is not a medical provider and does not have the authority to order specific treatment and that there is no evidence that her actions were motivated by retaliatory animus.

*Deliberate Indifference*

Ms. Scott responded to two grievances submitted by Mr. Perry. First, Mr. Perry filed a grievance on July 15, 2018, regarding his July 6, 2018 appointment with Dr. Cabrera and asking to be tested for Hepatitis A. Dkt. 416-1 p. 253. Ms. Scott responded to the grievance:

> You were seen on 7618 and as a result of this evaluation your case was presented to a collegial panel of providers to determine if a liver ultrasound was needed at this time. Based on your clinical condition and lab results no liver ultrasound is clinically indicated at this time. Your condition and lab levels will be reevaluated in 6 months. Hepatitis management guidelines are being followed at this time.

Dkt. 416-1 p. 254. Next, on or around July 27, 2018, Mr. Perry submitted a grievance regarding the pain medication that had been prescribed by Dr. Cabrera during a visit on July 20, 2018, stating his concern that the medication would be bad for his liver and stating that he had requested

Tramadol instead. Dkt. 381-11 p. 10. Ms. Scott coordinated with medical staff at the facility and was notified that Dr. Cabrera was aware of Mr. Perry's conditions and risk factors but decided not to prescribe Tramadol was because Tramadol is a narcotic type medication with highly addictive properties. Dkt. 381-5 ¶ 7; dkt. 681-11 p. 10.

Ms. Scott is not a medical provider and therefore "is not deliberately indifferent for relying upon medical staff to make appropriate decisions regarding treatment." *Ortiz v. Bezy*, 281 Fed. Appx. 594, 598 (7th Cir. 2008) (citing *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)). It is undisputed that she investigated Mr. Perry's grievances and concluded that medical personnel were treating him based on their judgment. She is therefore entitled to summary judgment on his deliberate indifference claim.

*Retaliation*

Ms. Scott seeks summary judgment on Mr. Perry's retaliation claim because there is no evidence that she was aware of or involved in prior grievances or complaints filed by Mr. Perry or that any of her actions were motivated by retaliatory animus. To prove his First Amendment retaliation claim, Mr. Perry must show that his protected activity was the cause of the retaliatory action. He can do so by showing that the "protected activity was 'at least a motivating factor' for the retaliatory action." *Thomas v. Anderson*, 912 F.3d 971, 976 (7th Cir. 2018) (quoting *Perez*, 732 F.3d at 783). Mr. Perry asserts that Ms. Scott retaliated against him for filing grievances and lawsuits. Ms. Scott argues that her actions were not motivated by retaliatory animus. A defendant can defeat a retaliation claim "by showing that [her] conduct was not a necessary condition of the harm—the harm would have occurred anyway." *Greene v. Doruff*, 660 F.3d 977, 980 (7th Cir. 2011). Here, Ms. Scott has shown that her actions in responding to Mr. Perry's grievances were

32

based on her investigation and coordination with medical personnel. She has therefore shown that she did not retaliate against Mr. Perry and she is entitled to summary judgment on this claim.

### 6. Ms. Auler

Mr. Perry's claims against Ms. Auler are that she was deliberately indifferent to his liver condition, chest pain, trouble breathing, and throat bumps and that she retaliated against him.

*Deliberate Indifference*

On or around February 1, 2018, Ms. Smith contacted Ms. Auler regarding a grievance submitted by Mr. Perry, complaining of an alleged interaction with Nurse Jane Gregory a few days prior in which Mr. Perry reported that he was having difficulty breathing. Dkt. 381-6 ¶ 5; dkt. 381-11 p. 5. Ms. Auler reviewed the medical records, noting that Mr. Perry had recently been seen by Dr. Ippel, and also spoke with Nurse Gregory. Dkt. 381-6 ¶ 6; dkt. 381-11 p. 5. Ms. Auler noted that Mr. Perry had been assessed during an initial intake on January 12, 2018, and by the medical provider on January 19, 2018. Dkt. 381-6 ¶ 7; dkt. 381-11 p. 1. Ms. Auler also noted that she had spoken with Nurse Gregory regarding Mr. Perry's allegations and determined that Mr. Perry had not expressed concerns of an urgent medical matter. *Id.* It did not appear to Ms. Auler based on her review of the medical records and her discussion with Nurse Gregory that Mr. Perry was suffering from a medical emergency that required immediate medical attention. Dkt. 381-6 ¶ 9.

Like Ms. Scott, Ms. Auler is not a medical provider and therefore "is not deliberately indifferent for relying upon medical staff to make appropriate decisions regarding treatment." *Ortiz*, 281 Fed. Appx. at 598. It is undisputed that she investigated Mr. Perry's grievance and concluded that medical personnel were treating him based on their judgment. She is therefore entitled to summary judgment on his deliberate indifference claim.

*Retaliation*

33

Ms. Auler is entitled to summary judgment on Mr. Perry's retaliation claim for the same reasons Ms. Scott is entitled to summary judgment. Mr. Auler has shown that her actions in responding to Mr. Perry's grievances were based on her investigation and coordination with medical personnel.

### 7. Ms. Durm

Mr. Perry's claim against Ms. Durm is that she was deliberately indifferent to his liver condition and that she retaliated against him.

Ms. Durm was the HSA at NCCF from October 2017 through February 3, 2018. Dkt. 381-7 ¶ 1. Ms. Durm does not recall receiving any correspondence from Mr. Perry regarding his need for medical treatment. *Id*. ¶ 5. While Mr. Perry arrived at NCCF on or around January 10, 2018, she left her employment with Wexford just a few weeks later on February 3, 2018. *Id*. ¶ 6. Ms. Durm does not recall having any involvement in Mr. Perry's medical care while he was at NCCF. *Id*. ¶ 7. In the Amended Complaint, Mr. Perry alleges that after his interaction with Nurse Gregory on January 12, 2018, he wrote multiple healthcare requests to Ms. Durm. Mr. Perry saw a physician shortly after his intake and there is no evidence that Ms. Durm failed to perform any task required by her role as HSA. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Ms. Durm is entitled to summary judgment on Mr. Perry's claims.

### 8. Marissa Runyon

Mr. Perry admitted during his deposition that the claims against Ms. Runyon should be dismissed. Dkt. 381-9 p. 12 (Perry Dep. at 186:21-24). She is therefore entitled to summary judgment.

### 9. Dr. Mitcheff

34

Mr. Perry's claims against Dr. Mitcheff are deliberate indifference, medical malpractice, and retaliation.

On July 10, 2018, Dr. Mitcheff participated in a collegial call discussion with Dr. Ippel regarding the request for Mr. Perry to receive a liver ultrasound. Dkt. 381-8 ¶ 6. During this call, they discussed Mr. Perry's test results, including his APRI score. *Id.* Mr. Perry's APRI score was 1.74 which is elevated, and indicative of a patient with chronic HCV. Dkt. 381-8 ¶ 8. However, based upon their discussion and review of the records, Dr. Mitcheff testifies that there did not appear to be any symptomology or condition present that required an ultrasound. *Id*. Dr. Mitcheff indicated to Dr. Ippel that they could rediscuss as clinically necessary, and to follow-up in six months. *Id.* ¶ 9. At that time, discussions were ongoing with IDOC regarding changes to IDOC's Healthcare Services Directives for the treatment of HCV, including for the prescription of direct acting anti-virals as a treatment for chronic Hepatitis C. *Id.* ¶ 10.

*Deliberate Indifference*

Dr. Mitcheff is not entitled to summary judgment on Mr. Perry's deliberate indifference claim. While Dr. Mitcheff states that Mr. Perry did not have any symptoms or condition that would require a liver ultrasound, it is undisputed that Mr. Perry was infected with HCV and had an elevated APRI score. Dr. Mitcheff states that APRI scores are recommended for monitoring and prioritization of treatment by BOP treatment guidelines. Those guidelines state that an elevated APRI score may indicate liver damage. *See* Dkt. 416-1 p. 67. The guidelines further provide:

> abdominal imaging studies such as ultrasound or CT scan may identify findings consistent with or suggestive of the following: cirrhosis (nodular contour of the liver), portal hypertension (ascites, splenomegaly, varices), or hepatocellular carcinoma (HCC). Abdominal ultrasound is routinely performed in cases of known or suspected cirrhosis, and as clinically indicated on a case-by-case basis.

*Id.* A reasonable jury considering the evidence in the light most favorable to Mr. Perry, including the BOP guidance, might conclude that by denying the ultrasound request and not taking further steps to diagnose and treat Mr. Perry's condition, that these decisions were not made in the exercise of reasonable judgment but were made in disregard of Mr. Perry's serious medical needs. *See Petties*, 836 F.3d at 729 (published healthcare protocols provide circumstantial evidence that a healthcare provider knew of a substantial risk of serious harm). Dr. Mitcheff is therefore not entitled to summary judgment on Mr. Perry's deliberate indifference claim.

### Medical Malpractice

Dr. Mitcheff also moves for summary judgment on Mr. Perry's medical malpractice claims. Dr. Mitcheff argues that he did not authorize a liver ultrasound because a liver ultrasound is most often ordered to rule out hepatocellular carcinoma in someone with advanced liver disease and there was no indication that Mr. Perry had advanced liver disease. Because Mr. Perry has not shown that this conclusion was not within the standard of care, Dr. Mitcheff is entitled to summary judgment on his medical malpractice claim. Also, as noted with Dr. Ippel, there being no injury to Mr. Perry in this case, it cannot be shown that Dr. Mitcheff was breached any duty that proximately caused an injury.

### Retaliation

Dr. Mitcheff seeks summary judgment on Mr. Perry's retaliation claim. Dr. Mitcheff states that his recommendation was not based on any prior lawsuits, but instead, was based upon his medical opinion and judgment, based upon a discussion with Dr. Ippel and a review of the relevant medical records and lab testing. Dkt. 381-8 ¶ 11. Mr. Perry asserts that he has filed two other lawsuits against Dr. Mitcheff, *Perry v. Sims, et al.*, 1:17-cv-197-JMS-TAB and *Perry v. Swartzentruber et al*, 2:19-cv-373-JRS-MJD. But neither lawsuit is sufficient to show retaliatory

36

motive on Dr. Mitcheff's part. First, *Perry v. Sims* was filed in 2017, more than a year before Dr. Mitcheff denied the request for a liver ultrasound. A plaintiff may support a reasonable inference of retaliatory animus with the overall "chronology of events." *E.g.*, *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) ("Mays presented a chronology of events from which retaliation could be inferred; almost immediately after making his protected complaint about strip searches, the guards subjected him to a much more onerous search."). But "[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument, we typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). And *Perry v. Swartzentruber* was filed in 2019, well after the decision to deny the ultrasound. This lawsuit, therefore, could not have been a motivating factor in that decision. Further, Dr. Mitcheff has shown that his actions were based on his consideration of Mr. Perry's condition and testing and has shown that "his conduct was not a necessary condition of the harm—the harm would have occurred anyway." *Greene*, 660 F.3d at 980. Dr. Mitcheff has therefore shown that he did not retaliate against Mr. Perry and he is entitled to summary judgment on this claim.

### **The State Defendants**

Mr. Perry has sued Mr. Stafford and Mr. Smith for deliberate indifference and retaliation.

#### *Deliberate Indifference*

First, the State Defendants argue that, as non-medical prison officials they were entitled to rely on the decisions of Mr. Perry's medical providers.

Mr. Perry filed a grievance on July 15, 2018, regarding his July 6, 2018 appointment with Dr. Cabrera and asking to be tested for Hepatitis A. Dkt. 416-1 p. 253. Ms. Scott denied the grievance. Dkt. 416-1 p. 254. Mr. Perry appealed the denial of the grievance, and his appeal was

forwarded to Mr. Stafford, who referred the grievance to Mr. Smith. Dkt. 386-3; dkt. 386-4. Mr.

Perry's appeal was denied. On September 28, 2018, Mr. Smith stated:

> After review of the medical record, the facility response is accurate and appropriate
> at this time. You have been seen and continue to be seen for the concerns that you
> have addressed and the providers have followed appropriate medical protocol with
> regard to your treatment.   Your treatment plan is specific and is determined on an
> individual basis with regard to your care. Should you have questions, you should
> address with the provider on site; she will address your concerns.

Dkt. 416-1 p. 254. Mr. Stafford stated: "Your appeal was referred to the Division of Clinical Health

Care Services for review. In consultation with Department medical personnel, your records have

been reviewed and care is appropriate at this time." *Id.*

It is undisputed that the State Defendants relied on the decisions of Mr. Perry's medical

providers in denying Mr. Perry's grievance and concluded that medical personnel were treating

him based on their judgment. They are therefore entitled to summary judgment on his deliberate

indifference claim. *See Ortiz*, 281 Fed. Appx. at 598.

*Retaliation*

The State Defendants also seek summary judgment on Mr. Perry's retaliation claim. First,

Mr. Stafford asserts that Mr. Perry testified that he does not even recall whether he filed lawsuits

or grievances against Stafford before Mr. Stafford denied his grievance appeal, dkt. 386-7 at 27

(Perry Dep. at 246:2-15), nor has he presented any copies of grievances or complaints filed against

Mr. Stafford that would suggest Mr. Stafford had any reason to harbor retaliatory animus towards

him. Further, both State Defendants argue that their denial of Mr. Perry's grievance appeal was

based on their review of the medical records. They have therefore shown that their actions would

have occurred regardless of any retaliatory motive. *Greene*, 660 F.3d at 980. The State Defendants

have shown that they did not retaliate against Mr. Perry and they are entitled to summary judgment

on this claim.

**The Correctional Facility Defendants**

### 1. Mr. Butts

Mr. Perry's claim against Mr. Butts is that he delayed the grievance process with regard to his medical complaints. But Mr. Perry has submitted no evidence that Mr. Butts was involved in the grievance process or Mr. Perry's medical care. While Mr. Perry submits a letter he wrote to Mr. Butts's office complaining about the grievance process, there is no evidence that Mr. Butts received the letter, and even if he did, the receipt of a letter complaining about a subordinate is not enough to establish liability. *See Burks*, 555 F.3d at 595 ("[The plaintiff's] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor . . . and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care.  That can't be right."). Accordingly, there is no evidence that Mr. Butts was personally involved in any of the actions in the complaint or deliberately indifferent to Mr. Perry's serious medical needs or retaliated against him. Mr. Butts's request for summary judgment is therefore granted.

### 2. Ms. Heady, Ms. Nornes, Mr. Martin, and Mr. Thompson

Mr. Perry claims that Ms. Heady, Ms. Nornes, and Mr. Martin participated in hiring the detail worker who had threatened him. He further claims that Ms. Heady subjected him to a cell that had mold in the vent.

In August 2018, Mr. Perry filed a grievance stating that, in front of Sergeant Heady, another offender had threatened to put bodily fluids in his food. Dkt. 391-12 p. 13. In response, Ms. Heady stated that she was not on duty on the date referenced in the grievance and that there is no offender

with the name identified in the grievance. *Id.* p. 6. After Mr. Perry clarified his grievance regarding the date and the name of the inmate who threatened him, Ms. Heady states that she was aware that Mr. Perry and the other offender did not get along and she would order them to remain separated. Dkt. 391-4 ¶ 7.

Ms. Heady, Ms. Nornes, and Mr. Thompson are entitled to summary judgment on Mr. Perry's conditions of confinement claims. First, to the extent that Mr. Perry contends that Ms. Heady was aware that an inmate threatened to contaminate his food, it is undisputed that Ms. Heady was aware of the problems between Mr. Perry and this other offender and ordered them separated. Further, there is no evidence that any offender did contaminate Mr. Perry's food or that Ms. Heady, Mr. Martin, or Mr. Thompson failed to take steps to prevent potential contamination. *See Farmer*, 511 U.S. at 834 (an Eighth Amendment claim requires a culpable state of mind). Next, while Mr. Perry alleges that Ms. Heady was aware of mold in his vent and that Ms. Nornes had received an email about this condition, the only evidence on this point is that Ms. Heady responded to questions about Mr. Perry's complaints stating that there was milk, toilet paper, and paper in the vent. Dkt. 416-1 p. 223. There is no evidence that Ms. Heady or Ms. Nornes knew there was mold in Mr. Perry's vent and ignored this condition.

### 3. Ms. Smith, Ms. Strobel, and Ms. Nelson

Ms. Smith, Ms. Strobel, and Ms. Nelson each responded to grievances filed by Mr. Perry. He has stated deliberate indifference and retaliation claims against these defendants.

*Deliberate Indifference*

On June 30, 2018, Mr. Perry filed a grievance complaining of mold in the vent in his cell. Dkt. 416-1 p. 219. Ms. Smith sought and received information from Sanitation Supervisor Todd

Thibault and Ms. Heady. *Id.* p. 223. Their responses were emailed to Ms. Smith and Ms. Nornes.

*Id.* Ms. Smith responded to the grievance:

> According to Sanitation Supervisor Theibeault what is on the vent is the (powdered) milk and other substances that inmates use to adhere paper to the vent to block it off. This is not mold.
>
> Sgt. Heady reports that there is milk, paper and toilet paper that has been stuck on the vent. Offenders are given items to clean their cells every Friday. On 8/31/18, you were offered cleaning supplies and refused to clean your cell. There shouldn't be any mold in their cells/vents if they are cleaning them.
>
> Based on the above information offenders are responsible for cleaning their cells, this includes the vents. On multiple occasions you have been given the opportunity and supplies necessary to clean your cell. The substance on your vent or coming out of your vent is not black mold. It appears that If you were so concerned for your health and safety you would have taken it upon yourself and cleaned the vent/cell to meet your standards. If you have not chosen to clean the vent then that is on you. Your grievance issue has been addressed and no further relief can be offered.

Dkt. 416-1 p. 222. Mr. Perry appealed stating that he cannot clean the inside of the vent. *Id.* p. 221.

Ms. Strobel agreed with the response provided. *Id.* p. 221.

Ms. Smith and Ms. Strobel are entitled to summary judgment on any claim that they were deliberately indifferent to the condition of Mr. Perry's cell. Ms. Smith investigated the grievance and concluded, based on the responses she received, that there was no mold. Ms. Strobel relied on these reports as well. Based on these facts, no reasonable jury would conclude that she was aware of a risk to him based on the condition of his cell and disregarded it.

Next, in August 2018, Ms. Smith addressed Mr. Perry's grievances regarding his concerns that another inmate had threatened to contaminate his food. She first returned the grievance stating that there was no indication that Mr. Perry attempted to informally resolve his complaint and stating "Custody staff are right there with offenders when food is passed. How can body fluids be introduced into your food?" Dkt. 391-12 p. 14. She later responded to the grievance stating that Sergeant Heady was not on duty on the date referenced in the grievance and that there is no

offender with the name identified in the grievance. *Id.* p. 6.  She also explained that "it appears that food trays are escorted by staff and placed in the cuff port by the offender. Your grievance relief to not be forced to eat from inmates is your choice." *Id.* Mr. Perry appealed, explaining that he mistakenly identified the date of the incident and the name of the offender who had threatened him. *Id.*, p. 4-5. Ms. Nelson denied the appeal, agreeing with the response provided. *Id.* p. 4.

Ms. Smith and Ms. Nelson are entitled to summary judgment on Mr. Perry's claim regarding his fear that his food would be contaminated for the same reasons that Ms. Heady is entitled to summary judgment on this claim. They investigated this grievance and concluded that Mr. Perry's food was not being contaminated. No reasonable jury would conclude that they disregarded a substantial risk of harm to him.

Next, Mr. Perry filed several grievances regarding his medical care. On January 21, 2018, Mr. Perry filed a grievance alleging that Nurse Gregory denied him medical attention for chest pains and shortness of breath. Dkt. 416-1 p. 146. Ms. Smith contacted Ms. Auler regarding this grievance. Dkt. 381-6 ¶ 5; dkt. 381-11 p. 5. Ms. Auler reviewed the medical records, noted that Mr. Perry had been assessed during an initial intake on January 12, 2018, and by the medical provider on January 19, 2018. Dkt. 381-6 ¶ 7; dkt. 381-11 p. 1. Ms. Auler also noted that she had spoken with Nurse Gregory regarding Mr. Perry's allegations and determined that Mr. Perry had not expressed concerns of an urgent medical matter. *Id.* Mr. Perry filed a grievance appeal and Ms. Strobel denied the appeal. Dkt. 416-1 p. 145. On or around July 27, 2018, Mr. Perry submitted a grievance regarding the pain medication that had been prescribed by Dr. Cabrera, stating his concern that the medication would be bad for his liver and stating that he had requested Tramadol instead. Dkt. 381-11 p. 10. Ms. Smith contacted Ms. Scott on August 10, 2018. Dkt. 381-5 ¶ 6; dkt. 381-11 p. 10. Ms. Scott coordinated with medical staff at the facility and was notified that Dr.

Cabrera was aware of Mr. Perry's conditions and risk factors but decided not to prescribe Tramadol was because Tramadol is a narcotic type medication with highly addictive properties. Dkt. 381-5 ¶ 7; dkt. 681-11 p. 10. On March 13, 2018, Mr. Perry filed a grievance stating that he had an allergic reaction to his inhaler. Dkt. 416-1 p. 206. Ms. Smith returned the grievance because there was no indication he attempted to informally resolve his complaint. *Id.* p. 207. On April 23, 2018, Mr. Perry received a response stating "According to Ms. Auler, Wexford Medical you were ordered Zyrtec for allergies on 3/21/18. This medication would assist with the symptoms you were describing in this grievance." *Id.* p. 208. On March 9, 2019, Mr. Perry alleges that defendant Gaddis denied him a breathing treatment because he said he was going to file a grievance. Dkt. 416-1 p. 169. Mr. Perry grieved the issue and Lieutenant Gard responded to Ms. Smith's request for a response stating:

> Everything Offender Perry #138925 said in his grievance is true. However what Perry fails to mention is, Perry did receive a breathing treatment after our conversation at 0535 hours. I myself took him to the medical office for his treatment. I spoke to Officer Gaddis about his action and he said "okay." I don't believe we will have this issue again with Gaddis.

*Id.*

Ms. Smith and Ms. Strobel are entitled to summary judgment on Mr. Perry's claims based on his medical grievances. As non-medical prison personnel, they are entitled to rely on the conclusions of medical professionals with respect to medical care. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Further, to the extent that Mr. Perry complained that Officer Gaddis denied him a needed breathing treatment, Ms. Smith was told that the issue would not arise again. Finally, Mr. Perry filed a grievance on March 26, 2018, alleging that his grievance process had been denied. Dkt. 416-1 p. 184. Ms. Smith returned the grievance stating "your relief is already been given." *Id.* Ms. Smith's response to this grievance does not support a conclusion that she was

deliberately indifferent to any particular condition. There is no evidence that would allow a reasonable jury to conclude that Ms. Smith and Ms. Strobel disregarded any risk to Mr. Perry regarding his medical care.

*Retaliation*

These defendants are also entitled to summary judgment on Mr. Perry's retaliation claim. They investigated his grievances and provided responses based on their investigation. They have therefore shown that their actions would have occurred regardless of any retaliatory motive. *Greene*, 660 F.3d at 980.

**5. Mr. Gaddis**

Mr. Gaddis also seeks summary judgment on Mr. Perry's deliberate indifference and retaliation claims but does not provide any specific evidence or argument in support of his request. The evidence in the light most favorable to Mr. Perry is that Mr. Perry requested Mr. Gaddis transport him for a breathing treatment and told him he would file a grievance if he did not. Mr. Gaddis told Mr. Perry that he would have helped him except for his threat to file a grievance. While the Seventh Circuit has held that in some instances failure to treat shortness of breath is not deliberate indifference, *Bates*, 6 Fed. App'x at 428, here the evidence in the light most favorable to Mr. Perry is that Mr. Gaddis knew Mr. Perry needed a breathing treatment and refused to transport him, not out of any judgment of Mr. Perry's condition, but out of malice toward Mr. Perry. A reasonable jury considering these facts might find Mr. Gaddis liable for deliberate indifference and retaliation. Mr. Gaddis therefore is not entitled to summary judgment on Mr. Perry's claims against him.

## IV. Conclusion

Consistent with the foregoing, the Medical Defendants' motion for summary judgment, dkt. [379], is **granted in part and denied in part**. The State Defendants' motion for summary judgment, dkt. [386], is **granted**, and the Correctional Facility Defendants' motion for summary judgment, dkt. [389], is **granted in part and denied in part**.

The Medical Defendants' motion for oral argument, dkt. [433], is **denied as unnecessary**.

Mr. Perry's motions to supplement reply to defendants' summary judgment, dkt. [442], dkt. [450], motion to update exhibit, dkt. [463], and motion to update and supplement, dkt. [469] are **granted** to the extent that those filings have been considered.

Mr. Perry's motion for sanctions based on his contention that the Medical Defendants and the Correctional Facility Defendants filed improper motions for summary judgment, dkt. [443], is **denied**. Based on its review of the record, the Court finds that the defendants filed their motions for summary judgment in good faith and Mr. Perry was provided with ample discovery with which to respond.

Mr. Perry's motion for ruling on unanswered motions, dkt. [459], is **granted** to the extent consistent with this Order. The remaining motions will be considered as the Court's schedule permits.

Mr. Perry's motion to enforce state law procedures, dkt. [461], in which he apparently challenges actions by the Indiana Department of Insurance regarding his medical malpractice claims, is **denied as unnecessary** because his medical malpractice claims have been addressed on their merits.

The claims remaining are Mr. Perry's claims that Dr. Byrd, Dr. Ippel, Dr. Cabrera, and Dr. Mitcheff were deliberately indifferent to his liver condition, that Nurse Gregory retaliated against

him, and that Mr. Gaddis was deliberately indifferent to Mr. Perry's need for a breathing treatment and retaliated against him. The claims against LA VanNattaa also remain. *See* dkt. 474.

All claims against defendants Stafford, Michael Smith, Scott, Auler, Durm, Runyon, Butts, Heady, Nornes, Martin, Jennifer Smith, Strobel, Nelson, and Thompson have been resolved. The **clerk shall terminate** those defendants on the docket. No partial final judgment shall issue as to these claims.

The Court *sua sponte* reconsiders Mr. Perry's motion for assistance with recruiting counsel. That motion, dkt. [57], is now **granted**. The Court will attempt to recruit counsel to represent Mr. Perry for further proceedings in this matter.

**IT IS SO ORDERED.**


Date: 3/25/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JASON SETH PERRY
138925
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel